# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

---

UNITED STATES OF AMERICA
for the Use and Benefit of KINETIC
SYSTEMS, INC.,

      Plaintiff,

v.

SEABOARD SURETY COMPANY,

      Defendant.

No. CIV 06-829 BRB/WDS

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## PURSUANT TO FED. R. CIV. P. 52(a)

---

**BALDOCK**, Circuit Judge.[*]

---

Plaintiff Kinetic Systems entered into a subcontract with general contractor, The Austin Company, in April 2003 "for the design, engineering and construction of the process piping and underground utilities" for a "project known as the T-A50 Pump House and Influent Storage Facility . . . for Los Alamos National Laboratories" (LANL Project). Complaint (Doc. #1) ¶¶ 5 & 11. The original subcontract price was $3,204,841.00. Exh. C-4. When things went awry, Kinetic brought this action in September 2006 under the Miller Act, 40 U.S.C. §§ 3131-34,

---

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation pursuant to 28 U.S.C. § 291(b).

for a *sum certain* allegedly due on a payment bond issued by Defendant Seaboard Surety. See id. § 3133(b)(1).  According to the complaint, the amount due for unpaid labor, materials, and equipment was $1,014,031.22.  Complaint ¶¶ 25 & 30.  Prior to filing this lawsuit, however, Kinetic apparently asserted a payment bond claim against Seaboard in January 2006 for at least $1,123,631.00.  Exh. C-47.  Following an investigation, Seaboard and LANL in June 2006 paid Kinetic $677,870.82 for materials LANL had accepted.  Pretrial Order (Doc. #31) at 8, ¶ 10 (PTO).  In August 2006, LANL agreed to pay Kinetic an additional $145,152.00 for materials Kinetic had fabricated prior to termination of its subcontract with Austin.  Id. ¶ 11.

As early as the Pre-Trial Report, filed in December 2006, Seaboard asserted Kinetic was making "inconsistent statements regarding the amounts and components of its claims."  Amended Initial Pre-Trial Report (Doc. #10) at 4.  By the time of the Court's August 2007 Pretrial Order, Kinetic was claiming "money damages in the amount of $672,207.60."  PTO at 3.  That same month, Seaboard filed a motion for discovery sanctions (which the Court later construed as a motion in limine and denied as moot after trial).  Therein, Seaboard expressed mounting frustration over Kinetic's inability to provide Seaboard "basic information surrounding amounts and components of Kinetic's claims."  Seaboard's Motion for Rule 37 Sanctions for Failure to Comply with Rule 30(b)(6) Deposition (Doc. #24) at 8.

By the end of a two-day bench trial on September 11, 2007, Kinetic was claiming $399,558.49 plus interest on the payment bond.  Kinetic Systems' Closing

Trial Brief (Doc. #37) at Exh. B.  As illustrated by Kinetic's constantly shifting figures (much like the shifting sands of the Sahara), Kinetic knows neither for what, nor how much, it is owed, and neither does the Court.  Kinetic pled this case as one in law for a sum certain.  Because Kinetic failed to prove by a preponderance of the evidence what, if any, amount was due and owing from Seaboard on the payment bond, the Court awards Kinetic nothing and enters judgment in favor of Seaboard.

I.

Kinetic's presentation of its evidence was at best confusing.  At trial, Kinetic called three witnesses to the stand.  The Court shall trudge through their respective testimonies so the reader may fully appreciate the Court's vain attempt to set forth the evidence in an understandable fashion.  The first witness to testify was Terry James.  James was the *third* project manager assigned to the LANL Project.  Partial Transcript:  Testimony of Terry James (Doc. #45) at *3 (James Tr.).  James assumed management of the project in "early '05," nearly two years after the project commenced.  Id. at *14.  James testified as to the terms and conditions of the subcontract between Kinetic and Austin.  James explained the subcontract required Kinetic to install a "radiological liquid waste holding facility."  Id. at *6.  James also explained that Austin could not assign its rights under the subcontract to a third party absent Kinetic's consent.  See Exh. C-4, C-5a, C-5b, C-5c, C-5d, C-5e.

James addressed a work stoppage order that Kinetic received from Austin in July 2003, three months after execution of the subcontract.  The stoppage arose from

3

"a delay in approval from the Department of Energy (DOE) relating to the construction phase of the project." Exh. C-6.[1] The stoppage extended nearly a year and resulted in Kinetic requesting an "equitable adjustment" to the subcontract based on costs incurred and an escalation of material prices. James Tr. at *14. Austin issued Change Order (CO) 9 in which Austin granted the request and modified the subcontract, with LANL's approval, to reflect a cost increase of $626,110.00 and a new subcontract price of $3,855,348.21. Exh. C-30. James indicated $154,033.00 of the $626,110.00 remains unpaid. James Tr. at *20. For what specific materials and/or labor Kinetic is owed James did not say. Kinetic provided no supporting documentation, *e.g.*, material suppliers' bills or invoices, cancelled checks, or employee time sheets, to justify the $154,033.00 allegedly due on the payment bond.[2]

---

[1]   DOE owns LANL.  DOE contracts with the University of California to perform research and development work at LANL.  The University contracted with Austin to perform certain design-build construction work related to the LANL Project.  LANL's contract with the University provided that LANL would oversee the LANL Project.  For ease of reference, LANL is considered the project owner in this case.

[2]   James also addressed CO19, which LANL promulgated in February 2004. Exh. C-13.  Insurance standards governing the storage of nuclear waste necessitated a design change.  James testified Kinetic "didn't really understand the total cost impact of [CO]19."  James Tr. at *26.  Kinetic estimated the cost of the design change at $1,250,662.50.  Exh. C-17.  James testified, however, that Kinetic never actually incurred the estimated costs associated with CO19, and no portion of Kinetic's present claim was associated with CO19.  James Tr. at *28-29.

On July 29, 2005, Kinetic submitted three payment applications to Austin. This was sixteen months after Kinetic had issued written notice to Austin in March 2004 that Kinetic intended to terminate the subcontract for non-payment:

> Kinetic's primary basis for this termination extends to non-payment of costs incurred to date, with no indication of pending approval at Austin's, or the [Project] Owner's level until such time as the construction suspension established by [LANL] is lifted. It is now in the best fiscal interest of Kinetic to protect itself from any further adverse cost impacts on this project based on the extended delay in suspension.

Exh. C-15. Notwithstanding Kinetic's March 2004 notice, Kinetic apparently continued work under its subcontract with Austin once the work stoppage order was lifted in May 2004.

James testified that he prepared Payment Applications (PA) 12, 13, and 14. PA12, in the amount of $462,660.35, was Kinetic's "normally scheduled monthly payment application, . . . though nothing was really normal about the billing on this project . . . ." James Tr. at *30. James stated he did not know how much of Kinetic's prior billing of $848,023.80 as shown on page 1, line 7 of PA12 had been paid to date. Exh. C-19. The parties later stipulated that Austin had paid the entire $848,023.80 to Kinetic. James Tr. at *90-92. Kinetic offered an "invoice summary" which James prepared to justify the $462,660.35 billing charge. Exh. C-22. Kinetic, however, did not introduce into evidence any actual invoices , time sheets, or other underlying documentation related to PA12.

PA13 requested an additional $41,230.76. Exh. C-20. James explanation of PA13, like much of his testimony, was not entirely clear. When asked to explain the PA, James responded: "It was the release of retention of Payment Application 11 through Austin Company's Change Order 12." James Tr. at *38. The Court asked for clarification: "You want to run that by me again?" Id. James responded with much the same answer. Once again, Kinetic failed to offer any underlying documentation justifying PA13.

PA14 meanwhile requested $64,379.34 "for monies for the design element of the fabrication of six new tanks" associated with CO10. Id. at *39. Interestingly, page 1 of PA14 listed the cost to "[d]esign and [f]abricate (6) 51,000 Gallon FRP Tanks" as $790,017.00. Exh. C-21. On page 2, the same PA listed the cost for the same tanks as $1,287,587.00. Id. When asked to explain the discrepancy, James responded: "I don't recall exactly why there's a difference. I know that the manufacturer selected was the third manufacturer we had been through to design the tanks that were required. I don't recall why there's a difference." James Tr. at *40. Yet again, Kinetic offered no underlying documentation to support PA14.

Next up for discussion was a PA from Austin to LANL dated July 31, 2005. Exh. C-23. Austin's PA sought payment of $934,002.81. According to James, that figure included $693,491.00 in materials, specifically mixers and valves, that Kinetic had supplied to the project. James Tr. at *48. James did not indicate what portion of the $693,491.00 remains due and owing to Kinetic.

6

Around August 4, 2005, Kinetic received a letter from Austin indicating that LANL had withdrawn from Austin's contract the "[d]esign, fabrication, delivery, off loading, setting in place, hook-up, testing, start-up and on-site technical representation by the manufacture for the FRP storage tanks."  Exh. C-34.  Austin instructed Kinetic "to stop all work as it relates to only the procurement of the FRP storage tanks."  Id.  Kinetic continued work on the remainder of the project.

A month later, in September 2005, Kinetic received another letter from Austin. This letter informed Kinetic that Austin was assigning the subcontract on the LANL Project to LANL.  Austin wrote that LANL–

> by separate letter, will confirm that it has agreed to: (1) assume all liabilities of The Austin Company on the assumed Agreement/Order for liabilities arising after September 9, 2005; and (2) pay monies directly to the Subcontractor/Vendor for work through September 9, 2005, as may be due under the assumed Agreement/Order.

Exh. C-37.  Austin asked Kinetic to agree to the assignment by having "an authorized representative of your company sign the attached consent and release."  Id.  The "Acknowledgment and Release" proposed to release Austin from all liability to Kinetic related to the subcontract "except for amounts due for work performed on or before September 9, 2005 . . . ."  Id.  The proposed released asked Kinetic to specifically identify by invoice number and date all outstanding claims.

In a letter to Austin dated September 6, 2005, James, on behalf of Kinetic, explained why Kinetic was unwilling to release Austin from "all issues, known or unknown," and consent to the assignment:

7

> [T]here remain significant open items that have impacted Kinetic's ability to perform work under the subcontract. Some of these impacts, while occurring prior to September 9, 2005, and potentially continuing, effect work performed on both sides of the September 9 date. As such, Kinetic cannot be forced to be put into a position where there is no avenue for recovery of the costs and impacts created by others.
>
> In addition, The Austin Company is requesting that Kinetic put together all of the open items and costs associated with the same by September 9, 2005. This short time frame is unacceptable, especially considering the fact that Austin Company has not shared with us exactly what issues [LANL] will accept. As you are aware, there are several issues which have been open many months and despite such fact, Kinetic has continued to perform what work it can, albeit in an impacted manner. Without an indication of when any resolutions will be reached, Kinetic cannot come up with all of the issues to segregate as of the requested date, and enter into any form of release.

Exh. C-38.

On September 8, 2005, LANL notified Kinetic of the subcontract assignment, effective the next day. Exh. C-41. On September 9, 2005, Austin suspended all work that Kinetic was to perform under the subcontract. Exh. C-42. On September 30, 2005, Austin terminated the subcontract with Kinetic for convenience "in accordance with Article 10." Exh. C-46. In the same correspondence, Austin requested that Kinetic "[s]ubmit a termination settlement proposal." Id.; see Exh. C-5a, at ¶ 10.3.

On cross, Seaboard commenced to cast doubt on Kinetic's case and highlighted the uncertainty Kinetic's evidence engendered. Seaboard pointed out that the addendum to the subcontract between Austin and Kinetic addressed in detail the necessary supporting documentation to justify material and labor costs associated

with change orders and changes in the scope of work.  Exh. C-5b.  The provision of the subcontract addressing "Rules for Detailed Proposals," subsection D., concluded: "Backup documentation to validate cost, including but not limited to proposals or invoices for material, equipment, Sub-Subcontractor's costs, rentals, or any other cost will be required, and shall be submitted in the same detailed format as described [in subsections A., B., and C.]."  Id.  Subsection A., B., and C., addressed the documentation necessary to support charges for material and equipment, labor, and rental equipment, respectively.  James Tr. at *70-72.  Such documentation was conspicuously absent from the evidence Kinetic presented, specifically from CO9. Exh. C-30.

Seaboard next asked James about any termination claim or settlement proposal that Kinetic sent to Austin.  In a letter to Austin dated September 13, 2005, Kinetic acknowledged that Austin "fully intends to convert the suspension to a termination of the subcontract."  Exh. C-44.  Kinetic stated it would "track all of the costs associated with the current suspension and forward a change order for [Austin's] approval."  Id.  James' testimony indicated he did not know whether Kinetic sent Austin or LANL a termination claim or settlement proposal, and Kinetic never produced one.  James Tr. at *72-74.  In fact, Seaboard's cross-examination revealed James had no idea what amount Kinetic claimed was due and owing from Seaboard on the payment bond.  The exchange between James and Seaboard regarding PA12, 13, and 14 illustrate the point:

9

> Q.    Can you tell me what the . . . total dollar amount for equipment
> and materials that Kinetic ordered or fabricated for the Los
> Alamos project for which you've not received payment as of
> today?
>
> A.    No, I mean there's a process . . . to reconcile all of those figures.
> I mean I cannot off the top of my head, no.

Id. at *79.  In other words, a year into its lawsuit, Kinetic, as will become even more

apparent, had yet to "reconcile all of those figures."  Id.

James acknowledged that Kinetic's inventory of equipment and materials was

incomplete.  Id. at *79-80.  James stated that Kinetic had delivered valves for which

it had not received payment.  James Tr. at *81.  At that point, Seaboard introduced

a "Partial Release and Assignment" that Kinetic executed on June 7, 2006.  Exh.

C-76.  The release provided that in exchange for payment of $610.083.74 from

Seaboard and $67,787.08 from LANL, Kinetic released Seaboard "from *all claims*

related to the mixers and valves which the undersigned may have against Seaboard

Surety Co. . . . .  Id.  (emphasis added).

At the conclusion of James' testimony, the Court questioned him about the

amount of Kinetic's claim against Seaboard:

> Q.    Well, I have one question sir, . . . if I were to ask you right now
> what is the figure that you know from the basis of the documents
> that you've given me and that I have in front of me is the amount
> that you claim is owned, an exact dollar and cents, what's the
> exact dollar and cents?
>
> A.    I don't have the exact dollar and cents in my head.  $677,000?

James Tr. at *101-02.

Kinetic's next witness was Glen Hobratschk.  Hobratschk was Austin's chief financial officer during Austin's involvement with the LANL Project.  He stated that Austin filed for bankruptcy in October 2005.  Partial Transcript of Proceedings: Testimony of Glenn Hobratschk (Doc. #43) at 35 (Hobratschk Tr.).  Currently, Hobratschk is "assisting the liquidating trustee [in bankruptcy] in his finalization of the [Austin] estate."  Id. at 5.  Hobratschk stated he is assembling supporting documentation for Austin's claim against LANL for costs incurred before September 9, 2005, that is, the date LANL terminated its contract with Austin.  According to Hobratschk, Austin's attorney had a prior discussion with Kinetic about the costs Kinetic might want to include in Austin's claim against LANL.  Hobratschk stated Kinetic has yet to provide Austin any information to support a claim.  Id. at 9-10.

Hobratschk reaffirmed Austin's admission of February 2006 that Austin owed $608,291.92 to Kinetic.  Id. at 11-12.  Austin's admission, however, occurred five months before Seaboard and LANL agreed to pay Kinetic $610,083.74 and $67,787.08, respectively.  Exh. C-50, C-57, C-76.  Hobratschk also acknowledged that on August 1, 2005, Austin approved Kinetic's PA12, 13, and 14.  Exh. C-58, C-59, C-60.  Hobratschk did not indicate, however, what, if any, portion of those payment applications were actually paid.  The confusion as to what Austin actually paid Kinetic is well illustrated by Exhibit C-62, which was admitted as part of Hobratschk's testimony.  That exhibit consists of email correspondence between Hobratschk and Mary Alice McNamara of St. Paul Travelers, Seaboard's parent

company, trying to ascertain, with little success, what Austin actually paid Kinetic on PA12, 13, and 14.  Exh. C-62.

On cross, Hobratschk confirmed that Austin never received a subcontract termination claim from Kinetic, despite Kinetic's indication that it would submit such a claim.  He also confirmed that the terms of the subcontract obligated Kinetic to provide Austin with documentation supporting Kinetic's payment applications. Hobratschk Tr. at 34.  In March 2006, Kinetic filed a proof of claim against Austin's bankruptcy estate for $1,691,902.04.  Exh. C-72.  The claim amount, as per attached statements, consisted of the amounts listed as due on PA12, 13, and 14, *i.e.*, C-19, C-20, C-21, plus an unexplained amount from an unexecuted document also labeled as PA14.   The amount listed as due from Austin on that document was $1,123,631.57.  Exh. C-48.  Seaboard inquired:

> Q.   But the one that's marked C 48, as well as Page 11 of Exhibit C 72, it says Application No. 14 but there's no signature on it anywhere, am I right?
>
> A.   That's correct.
>
> Q.   Do you have any way of knowing whether this document, in fact, is a payment application at all?
>
> A    I do not.  In fact, I'm rather confused.

Hobratschk Tr. at 47-48.  As to Kinetic's proof of claim, Hobratschk testified:  "[T]o be quite honest with you, I could never reconcile the $1.6, $1.7 million."  Id. at 39.

Kinetic's third and final witness was its operations manager, Casey Reed.

12

Like James, Reed stated the LANL Project came under his supervision in early 2005.
Partial Transcript of Proceedings:  Testimony of Casey Reed (Doc. #43) at 50 (Reed
Tr.).   Reed first sought to explain the $1,123,631.57 figure on the "second" PA14.
Exh. C-48.  He stated the application was prepared in January 2006 and provided
"an accounting of contract to date which includes the components of additional
change orders and additional scope that had been completed."  Reed Tr. at 53.
Presumably, Kinetic's original demand against Seaboard for $1,123,631.00 originates
from this document.   Reed stated he and his staff developed the figures on the
document.  Id. at 50, 52.  Kinetic never offered supporting documentation to justify
its "accounting" on the "second" PA14.

Kinetic next turned to two documents, each labeled "Invoice."  According to
Reed, both purported to be "an accounting," dated March 15, 2006, of PA13 and 14
respectively, i.e., C-20 and C-21.[3]  Exh. C-66, C-67.  Reed stated that Terry James
prepared both "Invoices."   Reed Tr. at 61.   Invoice 13, i.e., C-66, claimed
$546,462.63 due and owing.  The invoice cursorily itemized $505,983.93 worth of
mixers and valves.  A notation of "Closed" on each account indicated Kinetic "had
received invoices for those purchase orders . . . ."  Reed Tr. at 64.  Kinetic, however,

---

[3]  At one point, Reed addressed the discrepancy between the cost of the six
"FRP Tanks" listed on pages one and two of original PA14.  Reed indicated the
lower figure of $790,017.00 reflected the base contract price of the tanks while the
larger figure of $1,287,587.00 reflected both the base price and the increased costs
associated with CO10.  Reed Tr. at 56.

13

never produced those invoices.  Reed testified that PA13 "was specifically for mixers and valves."  Id. at 72.  At this point, Reed had not yet acknowledged that Kinetic had released Seaboard from "*all claims*" involving mixers and valves.  Exh. C-76 (emphasis added).

Shortly thereafter, Reed acknowledged Kinetic's June 2006 settlement with Seaboard and LANL for $677,870.82, as reflected in the "Partial Release and Assignment," *i.e.*, C-76.  Reed. Tr. at 86.  Reed also indicated that Kinetic had reached a further settlement with LANL in August 2006 (paid in September 2006) for $145,152.00.  Exh. C-82, C-83.  Included in that settlement were "some transfer pumps, some HDPE material and NaOH storage tank."  Reed Tr. at 87.  Reed testified the latter settlement paid in part for items listed on invoice 14.  Exh C-67.

Invoice 14 claimed $685,189.58 was due and owing for a variety of equipment and supplies, at least $58,908.43 of which was for valves.  Reed indicated Kinetic had not been paid for any of the four "SS Pipe & Fittings"  purchase orders listed on the invoice.  Reed Tr. at 92-94.  That cost totaled $35,529.83.  Reed further stated that the $4,524.68 worth of "Carbon Pipe & Fittings" listed on the invoice remained unpaid.  Id. at 94-95.  "Consumables" and "Outside Rentals" for $25,196.45 and $11,275.69 respectively, remained unpaid.  Id. at 96-97.  Two of four items listed under "Equipment" had not been paid.  Id. at 98-99.  Those two items cost $4,020.00 and $12,875.76 respectively.  Reed next addressed the charge for "Valves" in the amount of $58,908.43.  When questioned by the Court, Reed stated he did not know

14

the source of that charge.  Id. at 99-100.  The final category listed on invoice 14 was "Services," which apparently included inspections, consultations, and engineering support.  Reed stated that no portion of the $295,795.82 allegedly due for services had been paid.  Id. at 101-02.

Reed concluded his direct testimony by stating that the amount Kinetic was claiming against Seaboard and the payment bond was: (1) the $154,033.00 allegedly due as a result of CO9, i.e., C-30, plus (2) the unpaid items totaling $448,126.66 identified on invoice 14, i.e., C-67, plus (3) 10% overhead and 10% markup on the those unpaid items from invoice 14 totaling $89,625.33.  Reed. Tr. at 104-06.  Based on these figures, Kinetic at this point apparently claimed $691,785.09 on the payment bond.

On cross, Seaboard first focused Reed on the last page of CO9.  That page itemized the entire $626,100.58 cost of the change.  All but $80,000.00 of that figure was associated with "Future Costs."  The $80,000.00 costs incurred consisted entirely of "Project Manager Time," Project Engineer Time," and "Superintendent Time."  Exh. C-30.  At no time during trial, however, did Kinetic introduce time sheets to justify that figure.

As to the future costs listed on CO9, Reed acknowledged that "there are duplications between the items that are included in C 30 [CO9], the stoppage of work, request for equitable adjustment, the total $626,110, and attachments to Exhibit C 67 [invoice 14]."  Reed Tr. at 114.  Specifically, Reed admitted the "SS

15

Pipe & Fittings," "Carbon Pipe & Fittings," "Valves," and "Services" amounts listed as part of invoice 14 were also listed as part of CO9. Id. at 111-13. Reed also admitted the "NaOH Tanks" listed on CO9 were the same tanks that LANL had purchased as part of its August 2006 settlement with Kinetic. Id. at 113.

Seaboard pointed out the actual total cost of the "Consumables" itemized on invoice 14 did not approach the total of $25,196.45 listed on the invoice. Id. at 120-21. In fact, those consumables total $5,200.75. Reed could not identify precisely what consumables were included in that figure. Id. at 121. Nor could Reed state what the salvage value of the metal pipe was, or if Kinetic had sought to salvage the pipe. Id. at 116-19. Reed, citing the lack of purchase orders, could not identify what Kinetic actually rented in connection with invoice 14's listing of "Outside Rentals." Id. at 122. Reed knew literally nothing about the sink and drain listed under the "Equipment" portion of the invoice. Id. at 123-24.

Turning to listed "Services," Seaboard questioned whether an $11,386.00 charge for consulting services was for the purpose of assisting in the fabrication or construction of work on the LANL Project. Reed acknowledged that Kinetic received some consulting assistance in preparing CO9. Id. at 128. Continuing with the "Services" itemized on invoice 14, Seaboard inquired:

Q.   Harrington Environmental is on this list for $210.000; is that
     correct?

A.   That is correct.

16

Q.     That purchase order was cancelled and Kinetic doesn't have any responsibility, isn't that correct?

A.     I believe that's correct.

Id. at 126.   Reed admitted Kinetic had "not been presented a claim from the Harrington Company."   Id.   Reed also agreed that Kinetic "has waived all of its claims against Seaboard to recover for either mixers or valves provided to the [LANL] project."   Id. at 127.

Seaboard further pointed out that the terms of the subcontract between Kinetic and Austin did not permit a markup where the subcontract was terminated for convenience.   Exh. 5-a, at ¶ 10.3.   Seaboard also raised the question of whether some of the "future costs" listed on CO9 were prospective and not necessarily incurred at the time of the subcontract's termination.   Reed Tr. at 112-13.   Seaboard concluded its cross by asking Reed if he was aware that the amounts Kinetic claimed were due based on CO9 and invoice 14 did not add up to the $672,207.60 Kinetic claimed was due in the PTO.   Id. at 128.   At that point, the first day of trial concluded.

The next morning on redirect, Reed testified that on a prior version of invoice 14, consumables did amount to $25,196.45.   Exh. C-78.   Upon revision, Kinetic, apparently erroneously, deleted certain items and did not recalculate the total.   Partial Transcript of Proceedings:  Testimony of Casey Reed (Doc. #39) at 6-10 (Reed Tr. II).   The Court commented that it was "greatly disturbed by this turn of events."   Id. at 10.   As a result of Seaboard's piercing cross-examination the previous

17

day, Reed began to recalculate the amount allegedly due Kinetic based on invoice 14. Exh. C-67. To make an already long story shorter, Reed now claimed (1) $15,575.26 was due for "SS Pipe & Fittings" (down from the listed $35,529.83), (2) $794.70 was due for "Carbon Pipe & Fittings" (down from the listed $4,524.68), (3) $38,366.00 was due for "HDPE Pipe & Fittings" (down from the listed $64,980.14), (4) $25,196.45 remained due for "Consumables," (5) $11,275.69 remained due for "Outside Rentals," (6) $32,214.16 was due for "Equipment" (down from the listed $138.223.76), (7) nothing was due for "Valves" (down from the listed $58.908.43), and (8) $81,181.82 was due for "Services" (down from the listed $295,795.82). Reed Tr. II at 11-28.

All this was too much for the Court: "Counsel, you told me at the pretrial conference that we weren't going to be doing the accounting and that's all that we're doing here is just doing accounting that should have been done way before now." Id. at 26. Reed concluded by adding $40,920.92 for overhead and profit, which Kinetic claimed was recoverable under the subcontract, to reach a total claimed due on invoice 14 of $245,525.38 (the figures actually total $245,525.00). Id. at 28. Reed further continued to claim the $154,033.00 due under CO9. Id. at 28-29. Reed testified that prior to his cross-examination he was not aware of the duplication between invoice 14, i.e., C-67, and CO9, i.e., C-30. Id. at 29.

Given Reed's troublesome testimony, the Court permitted Seaboard to conduct recross on Reed. Seaboard pointed out that the list of consumables contained in

18

invoice 14 which Kinetic sent to LANL as part of its demand, Exh. C-64, was the same list contained in invoice 14 introduced as C-67. Reed. Tr. at 33-36. Reed could not say whether the version of invoice 14 that contained a list of consumables adding up to $25,196.45, Exh. C-78, was ever sent to anyone. Reed Tr. at 35. Reed could not identify the omitted consumables, totaling approximately $18,000.00 and labeled "Praxair." Id. at 37.

Seaboard next underscored that in calculating the price reductions for duplication between CO9 and invoice 14, i.e., C-30 and C-67, Reed had used incorrect cost figures from the "Cost" column on the last page of CO9, rather than the proper figures listed under the column "Agreed Settlement". Id. at 37-41, 49-50. Among other items, Seaboard referred to the "SS Pipe & Fittings" (cost of $19,954.57 and agreed settlement of $24,147.30), and the "Carbon Pipe & Fittings" (cost of $3,729.98 and actual settlement of $8,144.38). Turning to "HDPE Pipe & Fittings," Reed acknowledged that the price LANL paid Kinetic for "HDPE pipe" as part of their August 2006, $145,152.00 settlement was greater than the amount listed as due on invoice 14. Absent underlying invoices, purchases orders, or cancelled checks, Reed simply could not say whether the HDPE pipe for which LANL had paid Kinetic was the same HDPE pipe listed on invoice 14 in the amount of $38,366.00 (after subtraction for double-billing). Id. at 42-45.

A chemical tank itemized under the "Equipment" portion of invoice 14 was also part of LANL's August 2006 settlement with Kinetic. Nonetheless, Reed

19

testified that Kinetic was claiming against Seaboard the difference between the negotiated settlement price of around $45,000 and the invoice price of $72,900.00. Id. at 46-48. Finally, Seaboard once against questioned whether the subcontract allowed Kinetic to claim overhead and profit as part of its claim. Id. at 50-52.[4]

## II.

Miller Act litigation should be "plain and simple." F. D. Rich Co. v. Indus. Lumber Co., 417 U.S. 116, 130 (1974). To prove a Miller Act claim, a claimant must establish (aside from the jurisdictional requisites of the Act), by a preponderance of the evidence, that the claimant has not been paid for labor and materials supplied in the prosecution of work provided for in the contract. See Krupp Steel Prod., Inc. v. Aetna Ins. Co., 831 F.2d 978, 980 (11th Cir. 1987). In other words, first, a claimant must identify, with reasonable certainty, the labor and materials supplied. Second, the claimant must show that such labor and materials were supplied in prosecution of the contract. Third, the claimant must show, with reasonable certainty, what amount remains due and owing for such labor and materials. See Wallace v. Flintco Inc., 143 F.3d 955, 965 (5th Cir. 1998) (explaining that a subcontractor is required to prove his damages in such detail that the fact

---

[4] The only witness Seaboard called as part of its rebuttal case was Mary Alice McNamara. She is an officer of Seaboard's parent company and was responsible for handling the resolution of all claims against bonds furnished by Seaboard as part of the LANL Project. McNamara testified generally as to her frustration with Kinetic's inability to document and otherwise properly support its payment bond claim against Seaboard.

finder can estimate damages with reasonable certainty).[5]

That the foregoing recitation of Kinetic's trial evidence speaks for itself is painfully apparent.  This Court does *not* find credible any of the multiple, unsupported figures,  unattached to any readily identifiable materials or labor, which Kinetic presented to prove its payment bond claim against Seaboard.[6]  Kinetic moved numbers in this case like pieces on a chessboard.  Seaboard repeatedly presented flaws in Kinetic's claim calculations to which Kinetic responded by repeatedly revising its claim.  Given their obvious uncertainty as to how much, if anything, Kinetic is owed, and for what, the Court is unable to credit the testimony of either Terry James or Casey Reed.  The Court finds that neither James nor Reed, absent speculation, conjecture, and guess, has any idea for what, or how much, Kinetic is owed.

---

[5]  In <u>Wallace</u>, the subcontractor filed both a breach of contract claim under the Miller Act and a quantum meruit claim.  143 F.3d at 958, 964.  While Kinetic has not made a claim for quantum meruit, the Court doubts such a claim would have altered the Court's judgment here given the all too chaotic nature of Kinetic's trial evidence.

[6]  The Court concludes that the Miller Act's jurisdictional requirements have been met in this case.  The Court accepts James's testimony that Kinetic continued working on the LANL project until September 9, 2005.  Thus, Kinetic's one year period in which to bring a Miller Act claim ended on September 9, 2006.  <u>See</u> 40 U.S.C. § 3133(b)(4) ("An action brought under this subsection must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action.").  Kinetic filed its complaint on September 6, 2006.  Therefore, the Court finds Kinetic's Miller Act suit is timely.

A.

Let's begin with CO9.  Exh. C-30.  Kinetic presently claims $154,033.00 due and owing on CO9.  The entire cost of CO9 was $626,110.58.  Kinetic acknowledges that Austin paid Kinetic $472,077.58 on CO9.  But for which materials and/or labor Kinetic has been paid, and for which it has not, remains a mystery.  When Seaboard asked Reed whether he knew which of the multiple items on the spreadsheet attached to CO9 were included in the $472.077.58 payment, Reed responded:  "No, I don't." Reed Tr. II at 5.  James testified Kinetic had not been paid for all the valves which constituted a part of CO9.  James Tr. at *81.  Of course, by the end of trial, Kinetic acknowledged that nothing remained to be paid for mixers or valves.  This is in stark contrast to the thousands of dollars Kinetic claimed for mixers and valves at the trial's outset.  Moreover, Kinetic received payment for some of the items on CO9's spreadsheet, specifically pumps, storage tanks, valves and mixers, as part of its August 2006 settlement with LANL.  Reed. Tr. at 87.

The Court is unable to credit the bare spreadsheet, which Kinetic offered as part of CO9, as specifying the items for which Kinetic's has not been paid.  Contrary to the express requirements of the subcontract, the spreadsheet is devoid of supporting documentation.  James Tr. at *70-72; Exh. C-5b.  The spreadsheet does not specify the quantity or specific nature of the materials purportedly supplied in prosecution of the subcontract.  Kinetic introduced not one purchase order, cancelled check, employee time sheet, or other document to support the figures it presented in

22

CO9.  Exh. C-30.  Finally, except for $80,000.00 worth of undocumented labor, the costs set forth in CO9 are labeled as "Future Costs."  Kinetic offered no evidence as to the probable dates on which Kinetic performed work related to, or supplied material for, that portion of the LANL project involving CO9.

B.

Next up is "invoice 14."  Exh. C-67.  Kinetic most recently claims $245,525.38 is due and owing on invoice 14.  Kinetic arrived at that figure only after Seaboard "bludgeoned" Kinetic's operations manager, Casey Reed, on cross and recross examination.  Reed acknowledged that Kinetic's prior claim calculations on invoice 14 and CO9 contained significant double-billing.   Reed Tr. at 114. Astonishingly, Reed stated that prior to his trial testimony, he was unaware of the duplication.  Reed. Tr. II at 29.  Consequently, Reed had to perform mathematical calculations – while on the witness stand – in order to recalculate the amount of Kinetic's claim.  To add injury to insult, Reed performed this series of calculations using the wrong column of numbers found on CO9's spreadsheet.  Exh. C-30.

Equally damaging was Kinetic's inclusion in its "Services" list of a $210,000 charge (nearly one-third of Kinetic's final pre-trial claim) from Harrington Environmental (HE).  Reed acknowledged that Kinetic cancelled its purchase order with HE and HE had not presented Kinetic with a claim for the order.  Reed Tr. at 126.  The idea that Kinetic and Reed could not have known of this error, or for that matter most of the errors associated with their claim calculations, long before trial

23

is incredulous.  Kinetic and its management were at best quite careless, and perhaps reckless, in calculating and recalculating Kinetic's claim.  Seaboard makes the point in its written closing argument:  "How certain, how credible, can Kinetic be, in light of this vacillation and inexcusable inaccuracy?"  Seaboard Surety Company's Written Closing Argument (Doc. #38) at 5 n.3.

More problems pertaining to Kinetic's case abound, all too numerous to mention.  For example, Reed could not identify the nature of the "Consumables" listed on invoice 14.  Reed Tr. at 121.  Reed, himself citing a lack of purchase orders, could not identify what Kinetic had rented from the vendors listed under "Outside Rentals."  Id. at 121-22.  Reed knew absolutely nothing about the "Equipment" listed on invoice 14.  Id. at 123-24.  Reed could not identify the nature of consulting services listed under the "Services" portion of the so-called invoice. Id. at 128.  Again, absent invoices or cancelled checks, Reed did not know whether the HDPE pipe for which Kinetic is now asking  $38,366.00 under invoice 14 is the same HDPE pipe for which LANL had already paid Kinetic.

Even if the Court was inclined to guess as to the identity of the materials on which Kinetic has now decided to base its claim, Kinetic offered no convincing proof that any the materials for which it sought payment were supplied in the prosecution of its subcontract with Austin.  Kinetic simply seems to assume it.  Kinetic has not provided the Court with a single purchase order or design specification from which to conclude the materials listed in Kinetic's spreadsheets were manufactured or

acquired for use in the LANL Project. The Court sees no need to belabor any longer over that which is obvious from the trial transcript.

III.

To be sure, the Miller Act is "entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." United States *ex rel*. Moody v. Am. Ins. Co., 835 F.2d 745, 747 (10th Cir. 1987). But the Act does not demand guesswork; nor does the Act require that the surety calculate the subcontractor's claim on a payment bond. Those subcontractors, like Kinetic, that supply labor and materials for public projects have a responsibility to gather, maintain, and present for payment in an orderly fashion complete and accurate records. Kinetic's efforts fall far short of the mark. Because the Court finds that Kinetic failed to prove that any principal is due and owing under the payment bond, the Court need not concern itself with Kinetic's claims for overhead and markup, prejudgment interest, and attorney fees.

In conclusion, the Court finds Kinetic failed to –

1.  identify by a preponderance of the evidence the materials and labor for which it claims entitlement to payment under the payment bond;

2.  show by a preponderance of the evidence that such materials and labor were supplied in the prosecution of its subcontract with Austin; and

3.  establish by a preponderance of the evidence the amount that remains due and owing for such materials and labor.

25

JUDGMENT FOR DEFENDANT.

Entered for the Court
this 14th day of December, 2007


Bobby R. Baldock
United States Circuit Judge
Sitting By Designation